839 A.2d 1076 (2003)
Kathy Marie HOMZIAK, individually and on behalf of all others similarly situated Appellant,
v.
GENERAL ELECTRIC CAPITAL WARRANTY CORPORATION; Heritage Indemnity Corporation; Chase Manhattan Bank USA, N.A.; and Mervis Motors Inc. d/b/a Wetzel Motor Works Appellee.
Superior Court of Pennsylvania.
Argued August 28, 2003.
Filed November 18, 2003.
Reargument Denied January 28, 2004.
*1077 Michael P. Malakoff, Pittsburgh, for appellant.
R. Bruce Allensworth, Boston, MA, for Chase Manhattan Bank, appellee.
John Bobber, Philadelphia, for Mervis Motors, appellee.
Kandice J. Kerwin, Harrisburg, amicus curiae (did not argue).
Before: JOHNSON, HUDOCK and ORIE MELVIN, JJ.
JOHNSON, J.
¶ 1 In this matter, we consider whether Pennsylvania's Motor Vehicle Sales Finance Act (MVSFA or Act), 69 P.S. §§ 601-37, prohibits the sale of extended service contracts by motor vehicle dealerships at a price greater than dealer cost where the purchase is made by installment sales agreement. The trial court concluded that such sales, which include a profit for the seller, are not prohibited by the MVSFA. The court reasoned that any charge for the extended service contract, including dealer profit, is part of the "cash price" of the vehicle purchased and is therefore an allowable charge that the MVFSA does not seek to regulate. In *1078 accordance with this conclusion, the trial court dismissed claims by plaintiff Kathy Homziak, who individually, and on behalf of all others similarly situated, sought to recover against Mervis Motors, Inc. (Mervis), from whose Wetzel Motor Works she purchased a car and an extended service contract, and Chase Manhattan Bank USA, N.A. (Chase), the assignee of Homziak's installment sales agreement. Upon review, we conclude that the MVSFA does not prohibit the sale of extended service contracts at greater than dealer cost, nor does it prohibit their inclusion as part of the cash value of the motor vehicle so long as the corresponding charge is disclosed and voluntarily incurred by the purchaser. Accordingly, we affirm the trial court's order dismissing Homziak's claims.
¶ 2 On October 24, 1996, Plaintiff Kathy Marie Homziak purchased the extended service contract at issue here for a disclosed price of $1,180. Homziak agreed to finance the price of the service contract along with the value of the car she had purchased. Mervis, in turn, transmitted payment for the service contract to General Electric Capital Warranty Corporation (GE), which issued a contract agreeing to indemnify Homziak for certain mechanical failures of the car she had bought. Homziak does not contend that Mervis misrepresented the value of the contract or the service provided under it, or that Mervis or GE breached the contract's terms. Rather, she contends that Mervis violated the MVSFA by retaining a portion of the purchase price as profit rather than transmitting the entire amount to GE.
¶ 3 In support of this contention, Homziak commenced this action by class action complaint alleging, inter alia, that Mervis and GE violated, collectively, MVSFA sections 14, 17-19, and 31 (collected in Purdon's Pennsylvania Statutes at 69 P.S. §§ 614, 617-19, and 631). Homziak asserted that Mervis concealed from her that it had improperly received and retained a portion of the price of the service contract she had purchased, and alleged, on behalf of the class as a whole, that numerous unidentified motor vehicle dealers throughout Pennsylvania have engaged in similar conduct. Homziak also asserted derivative liability against Chase under Federal Trade Commission regulations (FTC Holder Rule) making any holder of a consumer credit contract subject to all claims and defenses the debtor could assert against the seller of goods or services financed.
¶ 4 Following service on all parties of the Complaint and later an Amended Complaint, Mervis filed preliminary objections in the nature of a demurrer asserting that the conduct Homziak alleged did not violate the MVSFA. Mervis argued that MVSFA section 18, see 69 P.S. § 618, on which Homziak relied to limit the amount of "costs" collectible by motor vehicle dealers, applied only to license, registration, and similar charges submitted to the Commonwealth of Pennsylvania to satisfy government imposed obligations prior to the purchaser's operation of the vehicle. Mervis argued further that any charge for extended service contracts was a component of the "cash price" of the vehicle as defined by MVSFA sections 3(11) and 14(B)(1), see 69 P.S. §§ 603(11), 614(B)(1), and was therefore specifically permitted, without limitation on the profit retained by the motor vehicle dealer. Chase joined in Mervis's objections, contending that its liability was derivative of any imposed upon the "seller of goods or services financed" and that any judgment rendered in favor of Mervis should also release Chase.
¶ 5 The trial court, the Honorable Robert P. Horgos, found Mervis's argument persuasive and sustained its preliminary objections, granting its demurrer and dismissing the claims Homziak raised under *1079 the MVSFA. Although the court grounded its analysis on rules of statutory construction, it also considered an administrative opinion of the Pennsylvania Department of Banking. In that opinion, the Department of Banking posited:
It is the Department's position that charges for extended warranties and service contracts at present are properly classified as a part of the "cash price" under Sections 3 and 14(B)(1) of the Act (MVSFA), and therefore may be marked-up and financed under an installment sale contract, assuming that the purchase of those items was voluntary for the consumer."
Trial Court Opinion, 11/19/02, at 10-11 (quoting Notice of Supplemental Authority filed on behalf of Defendant Chase Manhattan Bank USA, N.A., Pennsylvania Department of Banking Administrative Interpretation at 2). Following entry of the court's order, the Pennsylvania General Assembly passed a purportedly retroactive amendment to the MVSFA to "clarify" its provisions consistent with the interpretation rendered by the Department of Banking. Although the language of the amendments was not, per se, a factor in the trial court's decision, Homziak has raised its potential impact on review and all parties to this appeal have discussed its application. Accordingly, Homziak has stated the questions involved as follows:
1. Did car dealers violate the Motor Vehicle Sales Finance Act ("MVSFA") in effect on the dates of their installment sale transactions by imposing and retaining inflated service contract charges that substantially exceeded the actual cost of the service contracts?
2. Are the MVSFA claims asserted subject to retroactive application of post-appeal MVSFA amendments that, for the first time, authorize car dealers to impose and retain inflated service contract charges that exceed the actual cost of the service contracts?
¶ 6 Homziak's appeal arises from entry of an order granting preliminary objections in the nature of a demurrer. "Preliminary objections in the nature of [a] demurrer test the legal sufficiency of the plaintiff's complaint." Sexton v. PNC Bank, 792 A.2d 602, 604 (Pa.Super.2002). "The question presented by the demurrer is whether, on the facts averred, the law says with certainty that no recovery is possible." Mistick Inc. v. Northwestern Nat'l Cas. Co., 806 A.2d 39, 42 (Pa.Super.2002) (citation omitted). Thus, our scope of review is plenary and our standard of review mirrors that of the trial court. See id. Accepting all material averments as true, we must determine "whether the complaint adequately states a claim for relief under any theory of law." Id. (citation omitted)
¶ 7 In this case, Homziak's legal theory is derived from a collective reading of multiple sections of the MVSFA which, she contends, bar motor vehicle dealers from retaining a profit from the sale of goods or services not expressly authorized by the Act, and entitles purchasers to a refund of all amounts so held. Homziak premises her argument on MVSFA section 31, see 69 P.S. § 631, which states in pertinent part as follows:

§ 631. Prohibited charges
A. A licensee under this act shall not charge, contract for, collect or receive from the buyer, directly or indirectly, any further or other amount for costs, charges, examination, appraisal, service, brokerage, commission, expense, interest, discount, fees, fines, penalties or other thing of value in connection with the retail sale of a motor vehicle under an installment sale contract in excess of *1080 the cost of insurance premiums, other costs, the finance charges, refinance charges, default charges[,] recording and satisfaction fees, court costs, attorney's fees and expenses of retaking, repairing and storing a repossessed motor vehicle which are authorized by the provisions of this act.
* * * *
C. An installment sale contract, wherein the seller or any subsequent holder has charged, contracted for, collected, or received from the buyer any prohibited costs or charges whatsoever shall be unenforceable as to such prohibited costs or charges.
69 P.S. § 631 (footnote omitted). Attempting to employ the language of this section, Homziak argues that "under the MVSFA, a charge is prohibited unless expressly permitted." Because no portion of the Act made express reference to extended service contracts in 1996, when Homziak made her purchase, she contends that Mervis's collection of "inflated service contract charges," which included a profit for the dealer, violated section 31.
¶ 8 Her argument is buttressed, she contends, by MVSFA section 18, see 69 P.S. § 618, which, inter alia, limits the amount a dealer may collect for certain enumerated costs, confining them to the amount of any charge actually incurred by the dealership. Homziak relies on section 18(B), which provides as follows:
B. The seller of a motor vehicle under an installment sale contract may also contract with the buyer to pay on behalf of the buyer, such other costs incidental to the sale of a motor vehicle and contracted for voluntarily by the buyer as follows:
1. Fees, payable to the Commonwealth of Pennsylvania, for registration of the motor vehicle and issuance or transfer of registration plates.
2. Fees, payable to the Commonwealth of Pennsylvania, for driver's license for the buyer.
3. Costs of messenger service and other costs contracted for voluntarily by the buyer.

69 P.S. § 618(B) (emphasis added). Citing this section's inclusion of "other costs contracted for voluntarily by the buyer," Homziak asserts that "[s]ection [ ]18(B)(3) squarely encompasses the costs paid to a third party to secure a service contract for the car buyer." Homziak reasons that to the extent section 18(B)(3) includes charges for an extended service plan, those charges may not exceed dealer cost, and buyers are entitled to a remedy in the form of a refund of amounts they paid exceeding dealer cost. In support of the asserted remedy, Homziak relies on section 18(D) which, on the date of her purchase, provided as follows:
D. Such other costs paid or payable by the buyer shall not exceed the amount which the seller expends or intends to expend therefor. Any such costs which the seller has collected from the buyer, or which have been included in the buyer's obligation under the installment sale contract which are not disbursed by the seller, as contemplated, shall be immediately refunded or credited to the buyer.
69 P.S. § 618(D).
¶ 9 In response, Mervis, Chase, and Amicus Curiae Pennsylvania Automotive Association, an industry trade group, argue that charges for extended service contracts are properly included in the "cash price of the motor vehicle" as defined by MVSFA section 14(B)(1), see 69 P.S. § 614(B)(1), and are not subject to limits on retail pricing under the MVSFA. The trial court, citing the administrative interpretation of the Pennsylvania Department *1081 of Banking, reached the same conclusion. Trial Court Opinion, 11/19/02, at 9-10. Relying on section 14(B)(1), the court reasoned that:
The MVSFA does not regulate the cash price of a vehicle sales transaction and the dealer is free to negotiate a cash price that reflects vehicle options or add-on products selected by the purchaser.
* * * *
The cash price of the vehicle may include more than the vehicle itself, among other things, the cost of services, improvements and repairs.
Trial Court Opinion, 11/19/02, at 9. Further, the court disavowed Homziak's analysis of MVSFA section 18, concluding that its reference in subsection (B)(3) to "other costs" was not a catchall for "any costs" the parties negotiated. Trial Court Opinion, 11/19/02, at 8. Rather, the court reasoned, the meaning of the term is limited by the more specific references that precede it, denoting only costs similar to the government imposed fees enumerated in subsection (B)(1) and (2), and messenger service to transmit related state documents specified in subsection (B)(3). Trial Court Opinion, 11/19/02, at 8. The court concluded accordingly that the MVSFA does not operate to limit dealer mark-up on the price of extended service contracts or to prevent their inclusion in amounts financed through installment sale agreements. Trial Court Opinion, 11/19/02, at 11. Consistent with that conclusion, the court ruled that Homziak's claims provided no legal basis for recovery under the MVSFA.
¶ 10 Upon review of the MVSFA, we find no error in the trial court's determination. We recognize, as Homziak argues, that MVSFA section 31, see 69 P.S. § 631, prohibits a motor vehicle dealer from collecting or receiving any charge not contemplated by an enabling provision of the Act or including such a charge in a retail installment agreement. We recognize, as well, however, that charges for extended service contracts, including a reasonable profit for the dealer, are fairly included in the "cash price of the motor vehicle" as defined by MVSFA section 14(B)(1). Consequently, the prohibition of MVSFA section 31 is not implicated.
¶ 11 The MVSFA, considered in its entirety, is a regulatory statute the provisions of which are tailored to protect purchasers of motor vehicles from predatory credit and collection practices known to the framers of the Act prior to its adoption in 1947. See 69 P.S. § 602; see also M.M. Waterbor, Inc. v. Livingood, 179 Pa.Super. 610, 117 A.2d 790, 792 (1955). In its statement of "Findings and declarations of policy" underlying the Act, the Legislature recognized that such practices promoted exploitation of Pennsylvania's motoring public as
evident in the unfair provisions of the installment sale contract, exorbitant charges for credit, extortionate default, extension, collection, repossession and other charges, unconscionable practices respecting execution of contracts, refinancing of contracts, prepayment, refunds, insurance, repossession and redemption.
69 P.S. § 602(c). To curtail such practices, the Act provides a legislative mandate
to bring under the supervision of the Commonwealth all persons engaged in the business of extending consumer credit in conjunction with the installment sale of motor vehicles; to establish a system of regulation for the purpose of insuring honest and efficient consumer credit service for installment purchasers of motor vehicles; and to provide the *1082 administrative machinery necessary for effective enforcement.
69 P.S. § 602(d).
¶ 12 Consistent with these objectives, the MVSFA mandates and governs licensure of motor vehicle dealers and finance companies, 69 P.S. §§ 604-10, requires disclosure of the material terms of the sale transaction in a written contract of sale, 69 P.S. § 613, prescribes and defines such material terms, 69 P.S. §§ 603, 614, prescribes items that may and may not be financed through an installment sale contract, 69 P.S. §§ 618, 631, limits the amount of interest and/or finance charges that may be assessed, 69 P.S. § 619, and prescribes permissible means of repossession upon default, 69 P.S. § 623. Significantly, the MVSFA includes no language purporting to cap the profit a dealer may realize on the sale of the vehicle itself or precluding a profit on the sale of automotive accessories that the buyer elects to purchase with the vehicle after disclosure. Although the Act defines "cash price," see 69 P.S. § 603(11), and limits what charges may be included in it, see 69 P.S. § 614(B)(1) (defining "cash price of the motor vehicle"), it does so relative to the price a dealer might attempt to extort if the purchase were calculated only on the basis of installments. Thus, we are compelled to recognize, as have other jurisdictions interpreting similar legislation, that:
the MVSFA was designed to address usurious fees and improper conduct that occurred in the financing of an automobile. The act does not place any constraints or limitations on the profit earned from the sale of a motor vehicle and any accessories or purchaser options that may be included or negotiated with the sale.
King v. Ford Motor Credit Co., 257 Mich. App. 303, 668 N.W.2d 357, 365 (2003).
¶ 13 Moreover, we conclude that charges for extended service contracts are purchaser options, charges that may be included as part of the "cash price of the motor vehicle." A recitation of the related "cash price" definitions substantiates that conclusion. MVSFA section 603(11) defines "cash price" as follows:
11. "Cash price" shall mean the minimum price measured in dollars at which the seller would in good faith sell to the buyer or to any other buyer under like circumstances, and the buyer would in good faith buy from the seller, the motor vehicle which is the subject matter of the installment sale contract, if such sale were a sale for cash instead of an installment sale.
69 P.S. § 603(11). Section 614(B)(1) further defines what charges may be included in the "cash price." This subsection specifies only those items that relate directly to the purchase and delivery of the motor vehicle as a tangible good along with accessory purchases, modifications, and repair and maintenance service customary to the sale transaction.

§ 614. Contents of contract
* * * *
B. Every installment sale contract shall set forth the following separate items as such and in the following order:
1. Cash price of the motor vehicle. This amount may include any taxes, charges for delivery, cost of servicing, repairing or improving the motor vehicle, costs of accessories and installation or other costs normally included in the delivered cash price of such motor vehicle.

69 P.S. § 614(B)(1) (emphasis added). This language refers to specific items followed by the broader inclusion of "other costs normally included in the delivered cash price of such motor vehicle." Under our rules of statutory construction, this *1083 latter clause is properly interpreted to include items similar to those enumerated, i.e. "taxes, charges for delivery, cost of servicing, repairing or improving the motor vehicle, costs of accessories and installation...." See 1 Pa.C.S. § 1903(b) (restating the common law rule ejusdem generis; "[g]eneral words shall be construed to take their meanings and be restricted by preceding particular words"). Thus, while the MVSFA prohibits inclusion in the "price of the motor vehicle" of charges such as interest, it effectively allows charges that are related to the transfer, delivery, service or repair of the vehicle to be included in the "cash price of the motor vehicle." See Butler Fair and Agr. Ass'n v. Butler Sch. Dist., 389 Pa. 169, 132 A.2d 214, 219 (1957) ("General expressions used in a statute are restricted to things and persons similar to those specifically enumerated in the language preceding the general expressions." (citation omitted)).
¶ 14 Although the parties to this litigation hotly dispute whether charges for extended service contracts may be included in the "cash price of the motor vehicle," none of them contest the purpose of extended service contracts. As recognized by the Michigan Court of Appeals in King, "the purchaser of a motor vehicle buys an extended service contract to cover parts and labor for problems that may arise after the expiration of the manufacturer's warranty." 668 N.W.2d at 369. Thus, the extended service contract exists to ensure that the purchaser will be protected against the cost of such repairs in the future. Nevertheless, "[t]here is no guarantee that the purchaser will ever seek service following the purchase of the extended service contract and thus derive a benefit from the consideration paid." King, 668 N.W.2d at 369. Accordingly, we cannot conclude, as the defendants in this case assert, that the charge for the contract is itself a "cost of servicing, repairing or improving the motor vehicle" as delineated in MVSFA section 614(B)(1). We do conclude, however, that the purpose of the extended service contract, to provide future service and repair, is sufficiently consistent with the cost of servicing, etc., to bring it within the ambit of "other costs normally included in the delivered cash price of such motor vehicle." See 1 Pa. C.S. § 1903(b). Indeed, the extended service contract seeks merely to assure services after the delivery of the motor vehicle that the MVSFA expressly allows if completed by the dealer before delivery. Inclusion of charges for such contracts in no way contravenes either the statutory language or the policies underlying the Act so long as the charges are disclosed in writing and voluntarily incurred by the purchaser. Consequently, we conclude that the price of such contracts is a permissible component of the "cash price of the motor vehicle."
¶ 15 Moreover, we find no merit in Homziak's assertion that MVSFA section 18, see 69 P.S. § 618, prohibits dealer profit on the sale of extended service contracts. As discussed, supra, section 18 allows the seller of a motor vehicle to extend credit to the purchaser for certain enumerated expenses and to include those expenses in the sum to be repaid under the installment sale agreement. See 69 P.S. §§ 618(B)(1)(3). Section 18 provides further, however, that the seller may not retain any portion of the amounts withheld in excess of the actual amount of the stated expense, but must refund such excess amounts to the buyer. See 69 P.S. § 618(D). Hence, a motor vehicle dealer may not make a profit on any of the expense items enumerated in this section. The expense items to which that prohibition applies are, however, quite limited, and are delineated in section 18(B) as follows:

*1084 1. Fees, payable to the Commonwealth of Pennsylvania, for registration of the motor vehicle and issuance or transfer of registration plates.
2. Fees, payable to the Commonwealth of Pennsylvania, for driver's license for the buyer.
3. Costs of messenger service and other costs contracted for voluntarily by the buyer.
69 P.S. § 618(B). As discussed above, Homziak relies on the second clause of subsection (B)(3), which includes among the delineated expense items "other costs contracted for voluntarily by the buyer." Homziak contends that this clause necessarily includes charges for extended service contracts and effectively prohibits motor vehicle dealers from realizing a profit on their sale. We reject Homziak's expansive interpretation of this language. Applying the same rule of statutory construction cited in our discussion of MVSFA section 14, we conclude that this general language too must be limited in scope by the more specific preceding terms. See 1 Pa.C.S. § 1903(b) ("General words shall be construed to take their meanings and be restricted by preceding particular words."); see also Butler Fair, 132 A.2d at 219 ("General expressions used in a statute are restricted to things and persons similar to those specifically enumerated in the language preceding the general expressions."). Accordingly, "other costs" allowed by subsection (B)(3) must be in the nature of state-imposed fees for vehicle registration and license plates, see 69 P.S. § 618(B)(1), a driver's license for the buyer, see id. § 618(B)(2), and messenger service necessary to convey those fees to the appropriate state entities, see id. § 618(B)(3). Because charges for extended service contracts bear neither direct relation nor conceptual similarity to those three enumerated items, we cannot find them encompassed as "other costs" in section 18(B)(3). Accordingly, they are not subject to the prohibition on profit specified by section 18(D).
¶ 16 We hold accordingly that charges for extended service contracts are expressly permissible under the MVSFA so long as they are voluntarily chosen by the purchaser and are disclosed in writing in the installment sale agreement. See 69 P.S. § 614(B)(1). We hold further, that such charges are not subject to any limitation on profit by the prohibition in section 18 governing amounts that may be withheld for state-imposed fees and messenger service. Hence, we find no error in the trial court's conclusion that Homziak's claims under the MVSFA do not state grounds for relief cognizable under the statute. The court did not err in granting the defendants' demurrer and dismissing related claims against Mervis and Chase.
¶ 17 Because we have resolved the claims of the parties on the basis of Homziak's first question on appeal, we need not reach the claims in her second question concerning the effect, if any, of purportedly retroactive amendments to the MVSFA enacted after the entry of judgment in this case. For the foregoing reasons, we affirm the trial court's order.
¶ 18 Order AFFIRMED.